UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SANTO CRIVERA, JR.,

               Plaintiff,

      - against -

ACTING COMMISSIONER OF SOCIAL SECURITY,

               Defendant.
-----------------------------------------------------------------X

**MEMORANDUM AND ORDER**
16-CV-6095 (RRM)

ROSLYNN R. MAUSKOPF, United States District Judge.

      Plaintiff Santo Crivera, Jr. ("Crivera") brings this action against defendant Nancy A.

Berryhill,[1] Acting Commissioner of the Social Security Administration (the "Commissioner"),

pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3).  Crivera seeks review of the determination of an

administrative law judge ("ALJ") that she is not entitled to Disability Insurance Benefits ("DIB")

under Title II of the Social Security Act or Supplemental Security Income benefits ("SSI") under

Title XVI of the Social Security Act.  Both parties have moved for judgment on the pleadings

pursuant to Federal Rule of Civil Procedure ("Rule") 12(c).  (Pl.'s Mem. (Doc. No. 14); Def.'s

Mem. (Doc. No. 15).)  For the reasons set forth below, the Commissioner's motion is granted,

and Crivera's motion is denied.

## BACKGROUND

### I.    Procedural History

      Crivera filed applications for DIB and SSI on June 21, 2013, alleging disability beginning

December 1, 2012, due to his osteoarthritis of the hips and knees, left hip degenerative joint

disease requiring hip replacement, prior right hip replacement, two-inch leg-length discrepancy,

---

[1] This action was originally brought against Carolyn W. Colvin in her capacity as then-Acting Commissioner.  The
current Acting Commissioner, Nancy A. Berryhill, has been automatically substituted.  *See* Fed. R. Civ. P. 25(d).

back problems, non-insulin-dependent type II diabetes mellitus, obesity, and gout. (Admin. R. at 77–78.) These applications were denied on October 4, 2013, and Crivera requested a hearing before an ALJ. (*Id.* at 81–88.) ALJ Jack Russak held a hearing on May 12, 2015. (*Id.* at 34–60.) Crivera testified at the hearing via video-teleconference and was represented by his attorney, Andrew Woolf. (*Id.* at 36, 239.) On May 29, 2015, ALJ Russak issued a decision finding that Crivera was not disabled and denying him Social Security benefits. (*Id.* at 17–28.) On September 19, 2016, the Social Security Appeals Council denied review. (*Id.* at 1–3.) Crivera subsequently appealed to this Court. (Compl. (Doc. No. 1).)

## II. Administrative Record

### a. Non-Medical Evidence

Crivera was born in 1969 and was 46 at the time of the ALJ's decision. (Admin R. at 61.) Crivera has a twelfth-grade education. (*Id.* at 182.) From 2001 to 2003, he worked as a food server. (*Id.* at 182, 230.) In 2001, and again from 2002 to 2004, he worked as a pharmaceutical salesperson for medical wholesalers. (*Id.* at 182, 230.) From 2008 to 2010, and again in 2012, he was self-employed as a salesperson, which involved buying and selling various items at flea markets. (*Id.* at 182, 230.) Crivera testified at the hearing and wrote in a disability report that he stopped working in late 2012 due to his hip, back, and knee problems. (*Id.* at 37, 180.) In 2013, Dr. James L. Bruno indicated on a medical form that Crivera's work history was "self employed." (*Id.* at 449.) No other evidence in the record indicates that Crivera worked after 2012. In June of 2014, Crivera began serving a term of incarceration at Lewisburg Penitentiary's satellite camp. (*Id.* at 234.) He was still incarcerated at the time of his ALJ hearing.

In a function report dated September 14, 2013, Crivera stated that he first began to

experience pain in his left hip, knees, and lower back in 2000, and the pain had gotten worse over time. (*Id.* at 197–98.) Crivera listed walking, sitting, and standing as activities that he was able to do before the onset of his disability, but could no longer do. (*Id.* at 190.) In the same document, however, Crivera indicated that standing for too long, and lifting, caused him sharp pain, and that he "cant walk pain [sic]." (*Id.* at 194.) He also stated that he was able to walk, but required a cane, and could only walk for 20 feet before needing to rest. (*Id.* at 196.) He reported taking Advil twice a day for the pain, noting that it only provided relief for around an hour. (*Id.* at 198.) Crivera wrote that he was not able to climb stairs, but at the hearing, he testified that he did use the stairs in his two-story home, but that it took him "a lot of time," he had to stop and rest every few steps, and it was difficult and painful. (*Id.* at 40, 195.)

Crivera also stated that he could not sit for long; however, in a field office disability report dated July 1, 2013, interviewer L. Stiland did not observe any problems with his ability to sit or stand. (*Id.* at 177, 195.) Crivera wrote that he needed a cane while walking, and could not walk more than 20 feet without stopping to rest for 10 minutes. (*Id.* at 196.) Crivera could not bend to put socks on, he had to sit in the shower, and needed his wife's help caring for his hair. (*Id.* at 190.) While incarcerated, he received help cutting his toenails on two occasions because of difficulty caused by his hip. (*Id.* at 54, 415, 426.) He could not stand long enough to cook, and relied on his wife to prepare his food. (*Id.* at 192.) Crivera testified at the hearing that he took his wife shopping for food, but waited for her in the car because he could not help her carry groceries. (*Id.* at 47.) He estimated that he could only carry about 10 pounds. (*Id.*) Despite this, Crivera did go shopping in stores to buy clothes twice a year. (*Id.* at 193.)

Crivera wrote that his daily activities included reading, watching television, and driving. (*Id.* at 190.) He had a driver's license and was able to go out on his own. (*Id.*) Crivera was able

to socialize with others, both online and in person, a few times a week.  (*Id.* at 194.)  He also attended church once a week.  (*Id.*)  Crivera tried to go outside every day.  (*Id.* at 192.)

While incarcerated, Crivera testified that he could only stand for about 15 minutes at a time and only walk half a block to a block.  (*Id.* at 50.)  However, he also testified that, in order to go to the library, he needed to walk from his housing building to the administrative building.  (*Id.* at 43.)  When asked how far this walk was, Crivera said, "I don't want to guess, but it has to be a few hundred feet, maybe 400 feet?"  (*Id.*)  The ALJ then asked if the distance was about the length of a football field, to which Crivera replied, "Yeah, about that much."  (*Id.*)  Crivera further testified that this distance was about the same as the distance he needed to walk for lunch and dinner.  (*Id.*)  Crivera explained that he did not go to the cafeteria for breakfast, because it involved too much walking.  (*Id.* at 42–43.)

### b.  Medical Evidence Prior to Alleged Onset Date

On May 22, 2002, Crivera, then 32 years old, visited Dr. Joseph Feliccia, an orthopedic surgeon, because of a history of progressive pain in the groin and both thighs.  (*Id.* at 257.)  Dr. Feliccia noted that Crivera was only able to walk a block or two with external support, but was not in acute distress.  (*Id.* at 257.)  On May 31, 2002, Dr. Feliccia took X-rays of Crivera's pelvis and hips, which revealed advanced bilateral osteoarthritis.  (*Id.*)  Dr. Feliccia said that it would be reasonable to consider surgical intervention in the form of total joint arthroplasty.  (*Id.*)

Crivera returned for a follow-up visit on February 10, 2003, still suffering from the same symptoms.  (*Id.* at 258.)  Dr. Feliccia noted that the X-rays were unchanged and again suggested total joint arthroplasty.  (*Id.*)  However, Dr. Feliccia advised that having both hips replaced simultaneously would increase surgical risk, so he recommended replacing them one at a time.  (*Id.*)  Crivera returned on February 20, 2004, to schedule his surgery.  (*Id.* at 259.)

On June 9, 2004, Dr. Feliccia performed a total right hip replacement. (*Id.* at 255.) Crivera's pre- and post-operative diagnoses were for severe osteoarthritis of both hips. (*Id.*) Crivera tolerated the procedure very well, and Dr. Feliccia stated that his prognosis was good. (*Id.* at 256.) At a follow-up visit, Crivera reported no pain, but discomfort in his left hip. (*Id.* at 260.) He was doing well, without complications, and was beginning to walk with partial weight bearing. (*Id.*) Dr. Feliccia said that Crivera could consider a left hip replacement as well. (*Id.*) By August 13, 2004, Crivera was walking with the use of a cane, and had minimal complaints about pain in his right hip. (*Id.* at 261.) Dr. Feliccia again recommended considering a total left hip replacement. (*Id.*)

On July 27, 2005, Crivera returned due to increasing pain in his left groin, radiating to his thigh, which was worse with weight bearing. (*Id.* at 262.) Dr. Feliccia noted that Crivera was moderately overweight, not in acute distress, and was able to straight leg raise. (*Id.*) In addition, he noted that Crivera's right leg was approximately half a centimeter longer than his left leg. (*Id.*) His left leg exhibited marked capsular tenderness anteriorly with hip flexion deformity of approximately five degrees. (*Id.*) On April 12, 2006, Crivera reported that he was happy with his right hip, but was experiencing worsening pain on the left side. (*Id.* at 263.) Dr. Feliccia continued to recommend total left hip replacement. (*Id.* at 262–63.)

### c. Medical Evidence After Alleged Onset Date and Before Date Last Insured

On August 22, 2013, Crivera visited Dr. David A. Drucker at New York Hip & Knee seeking a total left hip replacement operation. (*Id.* at 290.) Dr. Drucker described Crivera's pain as severe and incapacitating, not responsive to medical management, and causing interference with his daily life. (*Id.*) Crivera also complained of pain in both knees. (*Id.*) After a physical examination, Dr. Drucker concluded that he was well nourished, well developed, awake, alert,

oriented, and in no acute distress.  (*Id.*)  He found that Crivera had a very fixed external rotation contracture of the left hip, with minimal range of motion, and pain at the extremes of motion. (*Id.*)  Dr. Drucker diagnosed Crivera with end-stage osteoarthritis of the left hip, and agreed to schedule surgery after a medical evaluation by Crivera's primary care doctor, Dr. Ceka.  (*Id.* at 290–91.)

That same day, Crivera had a hip X-ray at Dr. Drucker's request.  (*Id.* at 264.)  The radiologist noted Crivera's total right hip prosthesis was in a good position.  (*Id.*)  However, on the left side, he observed marked circumferential narrowing of the joint space with irregularity and subchondral sclerosis, as well as associated spur formation along the femoral head and acetabulum, and mild protrusio acetabuli.  (*Id.*)  The radiologist's overall impression was severe degenerative changes in the left hip.  (*Id.*)  Crivera received another set of X-rays on September 25, 2013, this time of his hips and knees.  (*Id.* at 265.)  The left hip and knee each showed narrowing of the joints, which suggested arthritis.  (*Id.*)  The radiologist concluded that there was no acute fracture or dislocation, but that Crivera suffered from degenerative changes of the hip and knee.  (*Id.*)

On December 5, 2013, Crivera returned to Dr. Drucker, ready to proceed with his left total hip replacement operation.  (*Id.* at 289.)  However, when updating Crivera's medical history, Dr. Drucker became aware that Crivera's pulmonologist, Dr. Bruno, had not yet finished his pulmonary weight and sleep apnea workup.  (*Id.*)  Dr. Drucker explained that this workup needed to be done before Crivera could have the surgery.  (*Id.*)

### d.  Medical Evidence After Date Last Insured

In June of 2014, Crivera became an inmate at Lewisburg Penitentiary's satellite camp. (*Id.* at 234.)  The Bureau of Prisons ("BOP") noted that Crivera had the following chronic health

problems: pain in the hip, joint, and thigh; unspecified polyarthropathy or polyarthritis; benign essential hypertension; type II diabetes mellitus; and esophageal reflux.  (*Id.* at 310.)  While incarcerated, he had active prescriptions for acetaminophen, atorvastatin, clindamycin, glyburide, lisinopril, metformin, meloxicam, omeprazole, and sulfamethoxazole/trimeth.  (*Id.* at 305–07.)

At the recommendation of certified registered nurse practitioner Noel Trusal,[2] Crivera received numerous accommodations at Lewisburg Penitentiary.  He was permitted to carry a cane and was given "3x Wide" medical shoes.  (*Id.* at 327.)  He was placed in a first floor cell on the lower bunk.  (*Id.*)  Trusal indicated that Crivera should not be made to stand for prolonged periods of more than 15 minutes.  (*Id.*)  As a result, Crivera was permitted to skip to the head of the meal line and use the staff entrance to the administrative building that was closest to his housing.  (*Id.* at 329.)  In addition, he was not to perform cardiovascular exercise, run, jog, or play softball, football, basketball, or handball.  (*Id.*)  Further, he was not to be required to climb, use ladders, or lift more than 15 pounds.  (*Id.*)

On July 15, 2014, Crivera was evaluated by Dr. Chris J. Lee.  (*Id.* at 338.)  Crivera told Dr. Lee that he found using stairs very painful.  (*Id.*)  Dr. Lee noted that he walked with a labored, limping gait with a cane, that his left hip could flex only to about 70 degrees, and that he could tolerate virtually no internal or external rotation.  (*Id.* at 339.)  Dr. Lee also noted that Crivera's left leg was approximately two inches shorter than his right.  (*Id.* at 340.)  Dr. Lee diagnosed Crivera with severe degenerative joint disease in his left hip and recommended a consultation for orthopedic surgery.  (*Id.*)

On July 18, 2014, Crivera received X-rays of his left hip and both knees.  (*Id.* at 301–02.)

---

[2] Because Mr. Trusal is a nurse practitioner, and not a physician, under SSR 06-03p, 71 Fed. Reg. 45593 (Aug. 9, 2006), his opinion does not qualify as a "medical opinion," but instead is treated as an opinion from an "other source."

The hip X-ray showed severe degenerative joint disease.  (*Id.* at 301.)  The knee X-ray results showed an abnormal downslope to the medial tibial plateau bilaterally, and moderate to severe osteoarthritis.  (*Id.* at 302.)

Dr. Lee saw Crivera again on July 22, 2014, and requested a shoe insert/lift for his left leg to compensate for the length discrepancy.  (*Id.* at 366.)  On September 11, 2014, Crivera saw Trusal, who also recommended total left hip replacement and a heel lift.  (*Id.* at 388.)

On September 18, 2014, Crivera's shower seat broke, causing him to fall and hurt his right knee.  (*Id.* at 395.)  He was diagnosed with knee and leg sprain and strain by certified registered nurse practitioner Anna Zimmerman.  (*Id.* at 394.)

Crivera saw Trusal again on January 7, 2015, and again requested a total left hip replacement.  (*Id.* at 405.)  Trusal noted that Crivera ambulated with a significant limp, requiring a cane, and hunched over to one side.  (*Id.*)  On January 16, 2015, and February 17, 2015, Dr. Lee helped Crivera cut his toenails, as his arthritis and artificial hip made external rotation difficult.  (*Id.* at 415, 426.)

On January 30, 2015, Crivera saw Trusal for a follow-up visit.  (*Id.* at 422.)  Trusal requested new X-rays because of Crivera's end-stage degenerative joint disease and worsening symptoms.  (*Id.*)  Crivera received these X-rays on February 12, 2015, which revealed severe degenerative joint disease.  (*Id.* at 304.)  Trusal again recommended total hip replacement.  (*Id.* at 422.)  He noted that Crivera had lost over 50 pounds since being incarcerated, dropping from 311 to 260 pounds.  (*Id.*)  Trusal also wrote that Crivera was taking ibuprofen 600 mg as needed for "unbearable pain."  (*Id.*)  In addition, he noted that Crivera had been trying to do rehab exercises such as straight leg raises and stretching exercises two to three times per week since July of 2014.  (*Id.*)  Crivera requested steroid injections for his hip pain, which were

administered on May 19, 2015, after a consultation with in-house orthopedic surgeon, Dr. Ball. (*Id.* at 460, 462.)

### e. Consultative Examination

On September 25, 2013, Crivera received a consultative examination from Dr. Lamberto Flores on behalf of the Social Security Administration. (*Id.* at 267–72.) At the time, Crivera was 44 years old and had stopped working two years prior. (*Id.* at 267.) Dr. Flores noted Crivera's history of severe osteoarthritis, non-insulin-dependent diabetes mellitus, gout, and acid reflux. (*Id.*)

Crivera reported that he walked with a cane on the right side to relieve pressure on his back, left hip, and left knee, and claimed he could not tolerate prolonged walking for more than 300 feet without pain. (*Id.* at 268.) He mentioned no symptoms from prolonged sitting. (*Id.*) Crivera said that he could not tolerate prolonged standing for more than five to ten minutes without pain. (*Id.*) He also indicated that he climbed stairs very slowly, one step at a time, while holding on to the railing, and reported severe knee and hip pain after climbing a flight of stairs. (*Id.*) Crivera was taking lisinopril, metformin, glipizide, Bayer Aspirin, Januvia, and Advil. (*Id.*) He drove to the appointment himself, and he lived in a two-story house with a flight of stairs. (*Id.*) Crivera said he passed his days at home watching television, going to doctor's appointments, and reading. (*Id.*) He said he did not cook or do chores. (*Id.*)

After a physical examination, Dr. Flores found that Crivera was well developed, well nourished, oriented, coherent, alert, obese, and in no acute distress. (*Id.* at 269.) He was six feet tall and weighed 310 pounds. (*Id.*) His range of motion was limited, with straight leg raises only possible from 0 to 40 degrees, and bending limited from 0 to 20 degrees. (*Id.*) He could not snap his fingers, but could do finger opposition and finger rolling. (*Id.* at 270.) His muscle

strength was 5/5.  (*Id.*)  He walked with a limping gait, needing a cane for support.  (*Id.*)  He had difficulty doing tandem, toe, and heel walking, but could perform these actions with a cane.  (*Id.*)  He could squat only one-third of the way down.  (*Id.*)  However, his posture was normal, and he had no difficulty getting on and off the examination table.  (*Id.*)

Based on his medical history and the examination, Dr. Flores diagnosed Crivera with severe osteoarthritis, non-insulin-dependent diabetes mellitus, gout, acid reflux, and obesity.  (*Id.*)  He opined that Crivera was limited in fully squatting, bending, and finger snapping; in tandem, toe, and heel walking without a cane; and in prolonged walking, standing, climbing stairs, and heavy lifting.  (*Id.*)  Dr. Flores recommended an orthopedic evaluation as well as weight loss.  (*Id.* at 271.)

### f.  Vocational Expert Testimony

Julie Andrews testified as a vocational expert ("VE") at the hearing.  (*Id.* at 56–59.)  The ALJ described a hypothetical individual of Crivera's age, education, and work experience, who could engage in sedentary work, but who could climb ramps and stairs only occasionally, and who could never climb ladders, ropes, or scaffolds.  (*Id.* at 57.)  In addition, this hypothetical individual could occasionally stoop, crouch, and kneel, but could never crawl, drive vehicles, or be exposed to moving machinery or unprotected heights, and would require the option to sit or stand alternately at will, provided that he would not be off-task for more than 5% of the day.  (*Id.*)  Further, this person must be able to use a handheld assistive device at all times while standing, and due to physical fatigue, must be permitted to go off-task for 5% of the day in addition to regular breaks.  (*Id.*)

VE Andrews testified that all of Crivera's prior work was classified as light, and therefore could not be performed by this hypothetical individual.  (*Id.*)  However, the jobs of

"order clerk" (DOT code 209.567-014), "preparer" (DOT code 700.687-062), and "brake linings coater" (DOT code 574.685-010) would be available. (*Id.* at 58.) When the ALJ modified the hypothetical to include off-task time up to 20%, Andrews responded that there would be no available jobs. (*Id.*) Mr. Woolf then asked if any jobs would be available with 8% off-task time in addition to the 5% for the sit-stand option. (*Id.* at 59.) Andrews answered that, because this would go beyond 10% total off-task time, there would be no available jobs. (*Id.*)

## STANDARD OF REVIEW

### I.    Review of Denial of Social Security Benefits

When reviewing the final determination of the Commissioner, the Court does not make an independent determination about whether a claimant is disabled. *Schaal v. Apfel*, 134 F.3d 496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmermann v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This

deferential standard of review does not apply, however, to the ALJ's legal conclusions."

*Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an

error of law has been made that might have affected the disposition of the case, . . . [an ALJ's]

failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d

183, 189 (2d Cir. 2004) (internal quotation marks omitted).

## II.    Eligibility Standard for Supplemental Security Income

To qualify for SSI benefits, a claimant must show that he is "unable to engage in any

substantial gainful activity by reason of any medically determinable physical or mental

impairment . . . which has lasted or can be expected to last for a continuous period of not less

than 12 months." 42 U.S.C. § 1382c(a)(3). The claimant's impairment must be of such severity

that he is unable to do his previous work or, considering his age, education, and work experience,

he could not have engaged in any other kind of substantial gainful work that exists in the national

economy. *Id.* In determining whether a claimant is disabled, the Commissioner engages in the

following five-step analysis:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.
>
> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.
>
> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.
>
> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.
>
> [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. § 416.920. The claimant has the burden of proof for the first four steps, but the burden shifts to the Commissioner for the fifth step. *Talavera*, 697 F.3d at 151.

### III.    Eligibility Standard for Disability Insurance Benefits

To establish eligibility for DIB, an applicant must provide medical and other evidence of his disability. 42 U.S.C. § 423(d). To be found disabled, the claimant must likewise have been unable to work due to "any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months," and the impairment must be of such severity that he is unable to do his previous work or, considering his age, education, and work experience, he could not have engaged in any other kind of substantial gainful work that exists in the national economy. *Id.* The five-step analysis conducted by the ALJ is the same as for SSI. *See* 20 C.F.R. § 404.1520.

**DISCUSSION**

### I.    The ALJ Properly Followed the Five-Step Analysis

The ALJ followed the sequential evaluation process set forth above. (*See* Admin. R. at 19–28.) At step one, the ALJ found that Crivera had not been engaged in substantial gainful activity since December 1, 2012, his alleged onset date. (*Id.* at 19.) At step two, the ALJ determined that Crivera had the following severe impairments: "non-insulin dependent diabetes mellitus, arthritis, left hip degenerative joint disease requiring replacement, right prosthesis, shortened left leg discrepancy of 1.5 to 2 inches requiring orthotic, bilateral osteoarthritis of the knees, history of back problems, and obesity." (*Id.*) At step three, the ALJ found that Crivera did not have an impairment or combination of impairments that met or medically equaled the

severity of a listed impairment.  (*Id.* at 20.)  The ALJ then determined that Crivera had the

residual functional capacity ("RFC") to perform sedentary work,

> except [Crivera] can only occasionally climb ramps and stairs, but can never climb
> ladders, ropes, or scaffolds.  He can occasionally stoop, crouch, or kneel, but can
> never crawl.  [Crivera] requires a sit/stand option that allows him to sit or stand
> alternatively at will provided that he is not off task more than 5% of the work
> period.  [Crivera] is limited to jobs that can be performed while using a hand held
> assistive device required at all times when standing.  He cannot be exposed to
> moving machinery, unprotected heights, or driving vehicles.  Due to physical
> fatigue, [Crivera] would be off task 5% of the day, in addition to regularly
> scheduled breaks.

(*Id.* at 21.)  At step four, the ALJ determined that Crivera did not have the RFC to perform his

past work.  (*Id.* at 26.)  At step five, relying on the testimony of the VE, the ALJ found that there

were other jobs that existed in the national economy in significant numbers that Crivera could

perform given his age, education level, work experience, and RFC.  (*Id.* at 27–28.)  Accordingly,

the ALJ concluded that Crivera was not disabled.  (*Id.* at 28.)

## II.     The ALJ's Decision Was Supported by Substantial Evidence

Crivera identifies four grounds on which he argues the ALJ's decision was deficient.

First, Crivera argues that the ALJ failed to evaluate Crivera's credibility correctly.  Second, he

argues that the ALJ did not properly consider whether Crivera satisfied Listing 1.02 at step three

of the analysis.  Third, Crivera argues that the ALJ's RFC determination was not sufficiently

detailed with respect to his need to alternate between sitting and standing, and therefore the

vocational expert was unable to provide a reliable opinion about what jobs were available.

Fourth, Crivera argues that the consultative examiner's opinion was too vague to support an RFC

determination of sedentary, and the ALJ improperly relied on this opinion.  For the reasons set

forth below, each of these arguments lacks merit.

### a. The ALJ Correctly Assessed Crivera's Credibility

"It is the function of the [Commissioner], not the [reviewing courts], to resolve evidentiary conflicts and to appraise the credibility of witnesses, including the claimant." *Calabrese v. Astrue*, 358 F. App'x 274, 277 (2d Cir. 2009) (quoting *Aponte v. Sec'y, Dep't of Health & Human Servs.*, 728 F.2d 588, 591 (2d Cir. 1984) (alterations in original)). A credibility finding by an ALJ is entitled to deference by a reviewing court "because [the ALJ] heard plaintiff's testimony and observed his demeanor." *Gernavage v. Shalala*, 882 F. Supp. 1413, 1419 n.6 (S.D.N.Y. 1995).

When evaluating a claimant's assertions of pain and other symptoms, Social Security regulations set forth a two-step analysis. First, the ALJ must determine whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. §§ 404.1529(b), 416.929(b); *see also Genier v. Astrue*, 606 F.3d 46, 49 (2d Cir. 2010). Second, if there is such an impairment, the ALJ must consider the extent to which the claimant's symptoms can reasonably be accepted as consistent with the evidence in the record. 20 C.F.R. §§ 404.1529(c), 416.929(c); *see also Genier*, 606 F.3d at 49.

When evaluating the "intensity, persistence and limiting effects of symptoms, the Commissioner's regulations require consideration of seven specific, *objective* factors . . . that naturally support or impugn *subjective* testimony of disabling pain and other symptoms." *Dillingham v. Colvin*, No. 14-CV-105 (ESH), 2015 WL 1013812, at *5 (N.D.N.Y. Mar. 6, 2015). Those seven factors are: 1) the claimant's daily activities; 2) the location, duration, frequency, and intensity of the pain or other symptoms; 3) precipitating and aggravating factors; 4) the type, dosage, effectiveness, and side effects of any medications taken; 5) treatment other than

medication received; 6) any non-medical measures taken to relieve pain or other symptoms; and 7) any other factors concerning the claimant's functional limitations. 20 C.F.R. §§ 404.1529(c)(3)(i)–(vii), 416.929(c)(3)(i)–(vii).

"If the [Commissioner's] findings are supported by substantial evidence, the court must uphold the ALJ's decision to discount a claimant's subjective complaints of pain." *Aponte*, 728 F.2d at 591 (citations omitted). "The ALJ's decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the [ALJ] gave to the individual's statements and the reasons for that weight." *Watson v. Berryhill*, 732 F. App'x 48, 52 (2d Cir. 2018) (alterations in original) (citations omitted).

Here, the ALJ found that, although Crivera's medically determinable impairments could reasonably be expected to cause his alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Admin. R. at 24–25.) The ALJ based this decision on the fact that, despite Crivera's limitations, his testimony about his ability to walk and climb stairs was inconsistent with his statements concerning the scope of his limitations.[3]

Throughout the record, Crivera paints a dire picture of his ability to walk. At the hearing, he testified that he could only walk half a city block before he would need to stop or sit down. (Admin. R. at 50.) On his function report, Crivera listed walking, sitting, and standing as activities he could no longer perform. (*Id.* at 190.) On that same form, he wrote that he could

---

[3] The ALJ also found that Crivera's work, prior to his alleged onset date but after his doctors told him he needed a left hip replacement, suggested that his daily activities were greater than reported. (Admin. R. at 25.) Because the record shows that his condition has worsened over time (*id.* at 262–63, 422), it was inappropriate for the ALJ to conclude that Crivera's pre-onset work affected the credibility of his statements regarding his post-onset date limitations. However, the ALJ's credibility determination was adequately supported by other evidence.

not stand for long periods or walk because of pain, and that he could only walk 20 feet before needing to stop and rest. (*Id.* at 196.) However, these statements were inconsistent with Crivera's hearing testimony that, while in prison, he walked 400 feet twice per day for lunch and dinner. (*Id.* at 42–43.) Similarly, Crivera stated on his function report that he was not able to climb stairs. (*Id.* at 195.) However, he testified at the hearing that he could climb and descend stairs, although it took him a long time, and he needed to rest every few steps. (*Id.* at 40.) These inconsistent statements provide substantial evidence to support the ALJ's conclusion that Crivera's statements regarding the limiting effects of his symptoms were not entirely credible.

Crivera argues that the ALJ did not properly consider the seven objective factors mentioned above in making the credibility determination. The Court disagrees. The ALJ properly followed the analytical framework set forth by the regulations. First, the ALJ concluded that Crivera's impairments were medically determinable. (*Id.* at 24–25.) Next, he determined that Crivera's alleged limitations due to pain were not substantiated by the objective medical evidence. (*Id.* at 25–26.) In making this determination, the ALJ discussed Crivera's daily activities, the location and frequency of his pain, the fact that it was aggravated by weight bearing, the medication Crivera was taking, and Crivera's rehabilitation exercises. (*Id.* at 22– 26.) Furthermore, even where an ALJ fails to discuss all of the seven factors, remand is not required when the reviewing court can glean the rationale behind the decision. *Cichocki v. Astrue*, 534 F. App'x 71, 76 (2d Cir. 2013). Here, it is clear from the ALJ's detailed discussion that he appropriately considered the objective medical evidence in making his credibility determination.

Crivera also argues that the credibility determination was flawed because the ALJ relied on irrelevant evidence. According to Crivera, the fact that he could walk 400 feet twice per day

or go up and down a flight of stairs cannot be relevant to his credibility because this evidence is not indicative of his ability to do a full day's work. Here, Crivera confuses the RFC determination with the credibility determination. Crivera's ability to work has no bearing on the credibility of his subjective statements about his symptoms. The ALJ concluded that Crivera's hearing testimony was not consistent with the evidence in the record. This is a perfectly adequate basis for an adverse credibility determination. Thus, the Court concludes that the ALJ's credibility determination was supported by substantial evidence and must be upheld.

### b. The ALJ Properly Determined that Crivera Did Not Meet Statutory Listing 1.02

At step three of the five-step analysis, the ALJ must determine whether the claimant has an impairment that meets or equals one of the listings in Appendix 1 to Subpart P of Part 404. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). If the claimant has such an impairment, then he is considered *per se* disabled. Listing 1.02 in Appendix 1 relates to major dysfunction of a joint, which is characterized by "gross anatomical deformity" involving "one peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b." 20 C.F.R. pt. 404, subpt. P, app. 1 § 1.02. Section 1.00B2b defines the inability to ambulate effectively as

> an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

*Id.* § 1.00B2b(1). Further, to ambulate effectively:

> individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living . . . Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches or two canes, the inability to walk a block at a reasonable pace

on rough or uneven surfaces . . . the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail.

*Id.* § 1.00B2b(2). The plaintiff bears the burden of proof at step three. *See Talavera*, 697 F.3d at 151 ("The applicant bears the burden of proof in the first four steps of the sequential inquiry").

In his decision, the ALJ considered Crivera's left hip degenerative joint disease requiring replacement, right prosthesis, shortened left leg discrepancy, and bilateral osteoarthritis of the knees and concluded that these impairments did not meet the criteria of listing 1.02 because they had not resulted in the inability to ambulate effectively. (Admin. R. at 20.) The ALJ noted that, although Crivera used a cane for walking, it did not limit both of his upper extremities. (*Id.*) The ALJ further relied upon the fact that Crivera testified that he walked 400 feet twice per day for meals, that he was able to walk up a flight of stairs in his two-story home, and that he could go shopping in stores. (*Id.*) Crivera argues that the ALJ erred because this evidence was insufficient to conclude that he could effectively ambulate. The Court disagrees.

According to Crivera, the record demonstrates that he cannot walk a block at a reasonable pace, go shopping, or climb a few steps at a reasonable pace, and thus, is incapable of effective ambulation under § 1.00B2b(2). In support, Crivera points to his hearing testimony that he could not walk a block, could not help his wife shop for groceries, and was slow going up and down stairs due to pain, needing to rest every few steps. (Admin. R. at 40, 47, 50.)

However, as noted above, the ALJ correctly discounted the credibility of Crivera's statements regarding his limitations because of inconsistencies in the record. Specifically, Crivera testified that he walked 400 feet twice per day, undercutting his claim that he could not walk a block. (*Id.* at 43.) He also wrote on his function report that he went shopping for clothes twice a year, which although infrequent, undercuts his claim that he cannot go shopping. (*Id.* at

193.)

With regards to Crivera's ability to climb stairs, his testimony that he needed to rest every few steps does not show that he was unable to "climb a few steps at a reasonable pace" as set forth by the regulation. Although Crivera did testify that climbing stairs took him "a lot of time," and he reported the same to Dr. Flores, there is no objective medical evidence to support this claim. (*Id.* at 40, 268.) In light of the ALJ's adverse credibility determination, it was appropriate for the ALJ to conclude that Crivera had not met his burden of proof at step three.

There is evidence in the record that these activities were painful or difficult for Crivera, such as the accommodations he received in prison, exempting him from standing in line and allowing him to use a staff entrance to the administrative building. (*Id.* at 329.) However, the fact that he was capable of walking 400 feet, shopping for clothes, and going up and down a flight of stairs supports the ALJ's determination that Crivera could effectively ambulate. Because ineffective ambulation is a requirement of Listing 1.02, the ALJ correctly found that Crivera was not disabled at step three.

### c. The ALJ Properly Addressed Crivera's Need To Sit or Stand at Will

RFC assessments "must be specific as to the frequency of the individual's need to alternate sitting and standing." SSR 96-9p, 61 Fed. Reg. 34482 (July 2, 1996). Crivera argues that the ALJ's RFC determination was improper because it failed to provide sufficient detail as to how frequently Crivera needed to alternate between sitting and standing. Without a more specific limitation, Crivera argues, the VE could not accurately determine if work that could accommodate this limitation existed in the national economy.

Here, the ALJ determined that "[t]he claimant requires a sit/stand option that allows him to sit or stand alternatively at will provided that he is not off task more than 5% of the work

period." (Admin. R. at 21.)  Where an RFC condition allows a claimant to switch positions "at will," the requirement that the ALJ address frequency is satisfied.  *Sanchez v. Astrue*, No. 07-CV-6293 (LTS) (JCF), 2008 WL 4344567, at *7 (S.D.N.Y. Sept. 17, 2008), *report and recommendation adopted*, 2009 WL 874203 (S.D.N.Y. Mar. 30, 2009).  Additional specificity is not required here, as the RFC determination allows Crivera to switch positions as often as he chooses.  *Miller v. Astrue*, No. 11-CV-4103 (DLI), 2013 WL 789232, at *10 (E.D.N.Y. Mar. 1, 2013).  Therefore, the ALJ's RFC determination was sufficient to convey Crivera's limitations to the VE.

### d.  The ALJ's RFC Determination Was Proper, Even Without Reliance on the Consultative Examiner's Opinion

A medical opinion stating that a claimant has a "mild" impairment for standing and sitting is too vague to support a sedentary RFC determination without other evidence.  *Curry v. Apfel*, 209 F.3d 117, 123 (2d Cir. 2000).  Although sedentary work involves mostly sitting, because it will often involve some standing, walking, and lifting up to 10 pounds, a limitation on walking, standing, and lifting may not be consistent with sedentary work.  20 C.F.R. §§ 404.1567, 416.967(a).

Here, in making his RFC determination, the ALJ gave "great weight" to the opinion of the consultative examiner, Dr. Flores.  (Admin. R. at 25.)  Dr. Flores, among other conclusions, opined that Crivera was "limited" in several functions, most critically, prolonged walking, standing, and heavy lifting.  (*Id.* at 270.)  Crivera argues that the language "limited," without

explanation as to the degree of the limitation, was too vague for the ALJ to reach the conclusion that he could perform sedentary work.

However, even if these limitations were too vague, the ALJ's RFC determination was not based solely on Dr. Flores's opinion. It was supported by the evidence in the record as a whole. In his decision, the ALJ noted that Crivera testified that he could stand for 15 minutes, and that Mr. Trusal indicated that Crivera should not be required to stand for more than 15 minutes. (Admin. R. at 50, 329.) Crivera's ability to walk 400 feet twice per day is also relevant to his ability to stand for short periods. In addition, the RFC determination specified that Crivera should be allowed to sit or stand at will, thus limiting the amount he could be required to stand at work. The ALJ also recounted Crivera's testimony that he could lift up to 10 pounds, and Trusal's opinion that he should not lift more than 15 pounds. (*Id.* at 47, 329.) Therefore, even without relying on Dr. Flores's opinion, there is substantial evidence in the record to support the RFC determination.

## CONCLUSION

Accordingly, for the reasons explained herein, Crivera's motion for judgment on the pleadings (Doc. No. 13) is denied, and the Commissioner's cross motion for judgment on the pleadings (Doc. No. 15) is granted.

The Clerk of Court is respectfully directed to enter judgment accordingly and close the case.

SO ORDERED.

*Roslynn R. Mauskopf*

Dated: Brooklyn, New York
      September 26, 2018

_____
ROSLYNN R. MAUSKOPF
United States District Judge